IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| LEONARD LEE HALEY, #325235 | * | |
| Plaintiff, | | |
| v. | * | CIVIL ACTION NO. RWT-10-769 |
| | | |
| DR. COLIN OTTEY | * | |
| DR. THESSEMA | | |
| DIETARY LIEUTENANT YACENECH | * | |
| BOBBY SHEARIN, WARDEN | | |
| Defendants. | * | |
| | *** | |

## **MEMORANDUM OPINION**

I. PROCEDURAL HISTORY

This 42 U.S.C. § 1983 civil rights Complaint was received for filing on March 29, 2010. (ECF No. 1). Plaintiff, an inmate at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, states that since being confined at NBCI in February of 2009, he has been denied medical treatment for two serious medical conditions. He first alludes to his "shattered heels," which he asserts have thrice been surgically repaired. Plaintiff contends that he needs further surgery to remove plates and screws left from prior surgeries and needs treatment for "deteriorating" bones. He further states that he has been denied therapeutic shoes, assignment to a medical cell, a cane, and surgeon referral. Next, Plaintiff contends that he suffers from a rare form of gastroesophageal reflux disorder ("GERD") and has been told by physicians at previous correctional facilities that he will require surgery to correct the condition. Plaintiff additionally alleges that he has not been provided the appropriate "double portion" medical diet. Plaintiff seeks nominal, compensatory, punitive, and "emotional" damages, along with injunctive relief to provide him with adequate and appropriate treatment.[1]

---

[1] The attachments to the Complaint are primarily comprised of Plaintiff's administrative remedy grievances from 2008, when he was confined at the Western Correctional Institution and his internal memos, sick-call slips, and grievances to NBCI staff in 2009. (ECF No. 1 at Attachments). All materials

II.   PENDING MOTIONS

Currently pending before the Court are Defendant Ottey and Tessema's[2] Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 12) and Defendants Shearin and Yacenech's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 14). Plaintiff has filed Oppositions thereto. (ECF Nos. 17, 18, 22, & 23). The undersigned has examined the medical records and declarations submitted by the parties and finds that no hearing is necessary. See Local Rule 105.6. (D. Md. 2010). For reasons to follow, Defendants' pleadings, construed as motions for summary judgment, shall be granted.

III.   STANDARD OF REVIEW

Under revised Fed. R. Civ. P. 56(a):

A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one

---

relate to his heel and GERD conditions.

[2]   The Clerk shall amend the docket to reflect the correct spelling of Dr. Tessema's name.

side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." Id. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also E.E.O.C. v. Navy Federal Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. See Anderson, 477 U.S. at 252.

This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." Shin v. Shalala, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citation omitted). Indeed, the Court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. See Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting Felty v. Graves-Humpreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)).

IV. DISCUSSION

    1.    Facts

According to the medical Defendants, Plaintiff has a history of osteoporosis, GERD, and a right ankle injury. He sustained a crushed right ankle and a calcaneal (heel) fracture in 2005. While confined at the Western Correctional Institution ("WCI") in 2008, he received physical therapy ("PT") for his right foot from July 24, 2008 to September 14, 2008. Plaintiff was also provided an independent exercise program three times a day and directed to refrain from all other exercises or sports while he was receiving PT. (ECF No. 12, Ex. A at Ottey Aff.; Ex. B at pgs. 1, 4-6).

On August 6, 2008, Plaintiff reported that he was unable to walk on his left foot. On August 7, 2008, the physical therapist noted that Plaintiff complained of "nagging pain" in both heels and Achilles tendons. He informed the physical therapist that moist heat and electrical stimulation relieved the pain. On September 1, 2008, the medical progress notes reflect that Plaintiff was seen after he claimed he fell out of his bunk and hurt his ankle. He indicated that his ankle was swollen and bruised and he could not put weight on it. Plaintiff was given an ice pack for his ankle and advised to elevate his foot. On September 2, 2008, while WCI was on lock-down, he was seen in his cell by Nurse Hetty Trenum for a complaint that he "heard a pop in his left foot and it was very sore and tender." Plaintiff also indicated he had surgery on his foot seven or eight months earlier. Trenum's examination of Plaintiff's ankle and foot revealed a healing incision on the side of the foot, no drainage or redness, good circulation, and strong pulses. She referred Plaintiff to be seen by a physician. (Id., Ex. A at Ottey Aff.; Ex. B at pgs. 3-4, 7, & 9-10).

Plaintiff was seen by Dr. Ottey on September 6, 2008. Ottey was informed that four prior surgeries had been performed on the right ankle and that Plaintiff had constant pain and difficulty walking. The examination revealed no swelling of his right foot or ankle but some objective

4

tenderness was noted. Ottey ordered an x-ray, placed Plaintiff on crutches for three months, and prescribed ibuprofen (Motrin) for pain. (ECF No. 12, Ex. A at Ottey Aff.; Ex. B at pgs. 11-12 & 14-16). On September 28, 2008, Plaintiff informed the physical therapist that he had been engaging in physical activity (running) when he heard a pop and had pain in his right lower extremity ever since. The physical therapist noted that PT would be discontinued until x-ray results were obtained and PT was deemed a necessary regimen by a physician. (Id., Ex. A at Ottey Aff.; Ex. B at pg. 20).

The x-ray taken of Plaintiff's right ankle on September 23, 2008 showed a prior open reduction and internal fixation of Plaintiff's calcaneal fracture, but no acute facture or dislocation. The x-ray also showed moderate spotty osteoporosis.[3] On October 3, 2008, Dr. Samuel Deshay ordered additional PT for Plaintiff's right foot and the PT was reordered on October 23, 2008. PT was discontinued, however, when Plaintiff refused to participate. (Id., Ex. A at Ottey Aff.; Ex. B at pgs. 21-23, 29-30, & 32-34).

Medical Defendants allege that Plaintiff offered no further complaints about his foot until July 22, 2009, when he filed a sick-call encounter form at NBCI to complain about pain in both heels caused by the plates and screws. On July 28, 2009, Nurse Theresa Brenneman evaluated Plaintiff and noted tenderness of the ankles and a subjective pain level of nine out of ten. She indicated that Plaintiff otherwise had a normal pulse, gait, and range of motion. On July 31, 2009, Plaintiff submitted another sick-call request raising the same complaint. He was evaluated by physician's assistant ("P.A.") Lisa Schindler for heel pain in both feet on August 6, 2009. Plaintiff informed Schindler that it felt as if the plate or screw in his heels was coming loose. Schindler

---

[3] Osteoporosis is the loss of bone density and "spotty" osteoporosis can occur after immobilization due to a fracture.

5

noted that Plaintiff had surgery scars on both feet and reported mild pain on movement. An x-ray of Plaintiff's ankles was ordered and he was prescribed Motrin for pain. An x-ray of Plaintiff's right ankle showed no change from a prior x-ray. An x-ray for the left ankle was re-ordered. The x-ray of the left ankle taken on September 9, 2009, showed marked osteoporosis, but no evidence of a fracture. On December 21, 2009, Plaintiff was examined by Dr. Renato Espina and offered no complaints of any pain in his feet or heels at that time. Espina found no abnormalities of Plaintiff's extremities. (ECF No. 12, Ex. A at Ottey Aff.; Ex. B at pgs. 69-73, & 76-78).

On May 4, 2010, Plaintiff told P.A. Schindler that he had pain on his foot from hardware that had been in place for a long time and that he believed the hardware was loosening. Schindler ordered another x-ray of the right ankle and foot, which showed that the plate and screws were stable. The radiologist noted that there had been no significant change in Plaintiff's x-rays results since August 14, 2009.

The medical Defendants state that there is no need for Plaintiff to receive therapeutic shoes, a medical shower, or a cane. They further state that a request for an orthopedic surgery consultation to determine if the calcaneal hardware needs to be removed will be submitted to the utilization review contractor for the Department of Public Safety and Correctional Services ("DPSCS"), Wexford Health Services, Inc. (Id., Ex. A at Ottey Aff.)

With regard to Plaintiff's GERD, the medical Defendants affirm that on August 5, 2008, Plaintiff filed a sick-call request asking for a physician's order to be allowed to eat in his cell due to his regurgitation and vomiting of food. The request was refused, but Plaintiff was prescribed a mechanical soft diet. On September 6, 2008, Plaintiff was seen by Dr. Ottey for his complaints of difficulty swallowing (dysphagia), persistent vomiting, and weight loss. He informed Ottey that he had a "stricture" and had been told it needed to be repaired surgically. Ottey observed that

6

Plaintiff's weight had increased eight pounds from his last visit to 152 pounds. He nonetheless ordered Plaintiff a liquid nutritional supplement, one can twice a day, and a high calorie diet. Ottey also placed Plaintiff on a "feed-in" order for two months because of his purported vomiting. Because it was noted that Plaintiff had gained weight in the past year and had a normal body mass index, on September 11, 2008, Dr. Iasais Tessema discontinued Plaintiff's order for Ensure, a high calorie diet, and feed-in. Instead, a regular diet was ordered for Plaintiff and this order was renewed by Dr. Deshay on September 24, 2008. On October 3, 2008, Dr. Deshay prescribed Zantac for Plaintiff's GERD and discontinued his mechanical soft diet. (ECF No. 12, Ex. A at Ottey Aff.; Ex. B at pgs. 13, 27-19, 26-28, 35, & 40-41).

On January 14, 2009, Dr. Deshay evaluated Plaintiff in the clinic and noted that his weight had decreased to 134 pounds. Deshay ordered another type of nutritional supplement drink, Boost, once a day for Plaintiff's diet. Deshay also added Reglan, a medication to treat heartburn, to Plaintiff's medical regimen. Plaintiff's blood cell count tests, taken on January 20, 2009, were all within normal limits. On February 4, 2009, Plaintiff was transferred to NBCI.

Plaintiff submitted sick-call encounter forms asking about his Boost and medical diet and complained that he routinely regurgitated his food. Plaintiff was seen by Nurse Rachael Warnick on February 7, 2009, and was further evaluated by P.A. Schindler in the Chronic Care Clinic ("CCC") on February 16, 2009. Plaintiff requested a high caloric diet and Boost. His weight at that time was 136 pounds. Schindler referred Plaintiff to Dr. Ottey for further evaluation regarding his diet. On February 17, 2009, Ottey evaluated Plaintiff in the CCC. He voiced subjective claims of vomiting after eating. Plaintiff weighed 135 pounds and had no complaints of diarrhea, constipation, or bloody stools. Ottey assessed Plaintiff as suffering bouts of GERD and achalasia.[4]

---

[4] Achalasia literally translates into the "failure to relax." It is the failure of the muscle

7

The prescription order for Boost remained in effect and Ottey renewed Plaintiff's Reglan prescription. On February 19 and 25, 2009, Plaintiff submitted sick-call request forms, complaining that he had not received the high calorie diet ordered by Ottey. On March 1, 2009, however, Ottey re-ordered Plaintiff's high caloric diet. (ECF No. 12, Ex. A at Ottey Aff.; Ex. B at pgs. 42-47, 49, & 52).

On March 5, 2009, Plaintiff submitted another sick-call encounter form, asking why he had not received his high caloric diet. On March 6, 2009, Dr. Deshay again ordered a high calorie diet for Plaintiff. Dr. Deshay noted that Plaintiff was receiving a dietary supplement, and he renewed Plaintiff's order for Boost on March 8, 2009. On March 18, 2009, x-rays of Plaintiff's chest and abdomen were taken. The x-rays showed no abnormalities except for mild fecal impaction. (Id., Ex. A at Ottey Aff.; Ex. B at pgs 54-57).

On May 22, 2009, Plaintiff was seen by Dr. Ottey in the CCC for his GERD. Ottey noted that Plaintiff's GERD occurred on a daily basis and was aggravated by cold liquids, eating, fasting, fatty and spicy foods, and large meals. He further noted that Plaintiff vomited after every meal. Plaintiff weighed 142 pounds. Ottey ordered a chemical profile, but otherwise indicated that Plaintiff had the knowledge and self-management skills to manage his care. (Id., Ex. B at pg. 61). Plaintiff continued to file sick-call request forms, stating that he was not receiving his medical diet tray. Ottey noted that plaintiff had an order for double portions and a diet supplement. On July 7, 2009, another x-ray of Plaintiff's abdomen was taken and showed that he was constipated. On June 12, 2009, Ottey evaluated Plaintiff in the CCC. He informed Ottey that he was still losing weight, had difficulty tolerating oral intake, and usually vomited after each meal or drinking water. Plaintiff

---

between the esophagus and the stomach to open, thus preventing food from passing through into the stomach. This can cause difficulty in swallowing as food may back up into the esophagus.

indicated that he had the sensation of something in his throat. On that day, Plaintiff weighed 139.9 pounds. Ottey ordered double portions for Plaintiff at his meals. (ECF No. 12, Ex. A at Ottey Aff.; Ex. B at pgs. 55-56, 61-64, & 67).

On August 6, 2009, Plaintiff weighed 144 pounds. On August 17, 2009, he submitted a sick-call request form, again complaining of constant regurgitation. P.A. Schindler evaluated Plaintiff on August 26, 2009. His weight on that day was 136 pounds. Schindler noted that she would look into the order for double portions. Plaintiff's blood test results on September 14 and November 3, 2009, were within normal limits except for an elevated phosphorous level, an elevated cholesterol level and a slightly decreased hematocrit level. On December 21, 2009, Plaintiff received his annual physical from Dr. Espina. He weighed 140 pounds and offered no complaints of GERD. Espina noted that Plaintiff was well nourished and was not in any apparent distress. (Id., Ex. A at Ottey Aff.; Ex. B at pgs 74, 79, 80-83, & 85-86).

On December 28, 2009, Dr. Espina evaluated Plaintiff in the CCC. He reported that he was experiencing mild heartburn, aggravated by hot liquids, large meals, and spicy foods. Plaintiff weighed 139 pounds. He did not report experiencing weight gain or loss, appeared well nourished, and was not in any apparent distress. Dr. Espina renewed Plaintiff's prescription for Boost, but the renewed prescription was denied on January 6, 2010, in light of the December 28, 2009 examination. (Id., Ex. A at Ottey Aff.; Ex. B at pgs. 87-89).

On March 4, 2010, P.A. Schindler ordered a high-caloric diet for Plaintiff. On March 19, 2010, his blood tests were all normal, except for slightly elevated glucose and elevated cholesterol levels. On April 7, 2010, Dr. Ottey examined Plaintiff in the CCC. Plaintiff stated the he vomited every time he ate but had no abdominal pain, diarrhea, or constipation. He indicated that he had a good appetite but was experiencing some hair loss, increased fatigue, and had lost about seven

9

pounds since December 2009. Dr. Ottey ordered blood tests to see if Plaintiff was anemic and added Prilosec, an over-the-counter treatment for GERD, to his medication regime. An abdominal x-ray conducted on April 13, 2010, was normal. On May 4, 2010, Schindler evaluated Plaintiff in the CCC. Plaintiff indicated that he had epigastric pain and heartburn daily, which was aggravated by hot and cold liquids, fatty foods, large meals, spicy foods, and lying in a supine position. He denied any relieving factors. Plaintiff's weight was 138 pounds. Schindler ordered blood tests to check Plaintiff's thyroid gland function. (ECF No. 12, Ex. A at Ottey's Aff.; Ex. B at pgs. 91-100 ). A gastroenterology consultation request will be submitted for approval.

In their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment Defendants Shearin and Dietary Lt. Yacenech seek dismissal of the case based upon Plaintiff's failure to state a claim upon which relief may be granted and to demonstrate a genuine dispute of material fact. (ECF No. 14). Shearin states that Plaintiff raised grievances regarding his medical care and was referred to the NBCI site medical provider. Yacenech affirms that Plaintiff was placed on a high caloric diet for one year on March 6, 2009. Under prison regulations, the diet is indicated for persons with medical conditions which result in documented weight loss of 10% of ideal body weight. The diet was renewed for an additional year on March 4, 2010. Yacenech maintains that he has in fact complied with all medical prescribed diets for Plaintiff. (Id., Ex. 2 at Yacenech Decl. and Attachments.)

In his oppositions to Defendants' motions, Plaintiff argues that Defendants were aware of his excessive weight loss and that he was in need of all medical items, facilities, and treatment sought. (ECF Nos. 17 & 18).[5] He claims that Defendants failed to send the Court his complete medical

---

[5] These Opposition pleadings are identical, except that the second Opposition is accompanied by an attached "Medical Advisory" written by a medical consultant to Prisoner Rights Information System of Maryland, Inc. ("PRISM") and a letter to Plaintiff from PRISM counsel.

records that reflect surgeries and treatment recommendations by hospital doctors. Plaintiff also claims that Dr. Tessema denied an order written by Dr. Espina and discontinued Dr. Ottey's order. He asserts that Ottey failed to ensure that he receive double portion meals, medications, treatment, and possible surgery, even though Plaintiff had submitted sick-call encounter forms complaining of such denial. He further claims that he was prescribed a "double-portion" diet by Dr. Ottey, yet never received the diet although he complained about it. He therefore contends that Yacenech "is attempting to mislead this court by not being totally truthful." (ECF No. 23).

2. Legal Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F. 3d 630, 633 (4th Cir. 2003) citing Wilson v. Seiter, 501 U.S. 294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with

unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. Farmer, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." Rich v. Bruce, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Virginia Beach Correctional Center, 58 F. 3d 101, 105 (4th Cir. 1995), quoting Farmer, 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." Farmer, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. Brown 240 F. 3d at 390; citing Liebe v. Norton, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." Johnson v. Quinones, 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. Id. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

As a fundamental element of § 1983 liability, Plaintiff must show that Warden Shearin was involved in the alleged deprivation of his constitutional rights. See Vinnedge v. Gibbs, 550 F.2d 926, 928-29 (4th Cir. 1997) (doctrine of respondeat superior does not apply to 42 U.S.C. § 1983 actions).

12

It remains uncontroverted that Shearin had no direct involvement in Plaintiff's medical treatment or any aspect of his health care. In addition, § 1983 supervisory liability on the part of Defendant Shearin requires a showing that: "(1) he failed promptly to provide an inmate with needed medical care, (2) he deliberately interfered with the prison doctors' performance, or (3) he tacitly authorized or were indifferent to the prison physicians' constitutional violations." Miltier v. Beorn, 896 F. 2d 848, 854 (4th Cir. 1990) (internal citations omitted); see also Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984) (supervisory liability for an inmate's beating by prison guards).

The Complaint against all Defendants shall be dismissed. The record shows that Plaintiff has received evaluation and treatment for his heel pain including but not limited to diagnostic testing, physical therapy, and pain medication. Medical staff has determined that he has no need for therapeutic shoes, medical showers or a cane. Further, there is no dispute that Plaintiff's GERD condition has been monitored and he has received abdominal and chest x-rays, as well as blood tests. Moreover, he has been prescribed different medications in an effort to lessen his symptoms. Finally, although the record shows that Plaintiff's symptoms and condition caused his weight to yo-yo through the course of his NBCI confinement, there is no dispute that his weight was continuously monitored and he was ordered high caloric meals and provided dietary supplements when needed. Plaintiff states that the Court has not been provided his entire record to show past surgical procedures and hospital physician recommendations. He contends that he does not have access to these records, yet does not in straightforward terms inform this Court what procedures and/or recommendations were made. Further, by attached exhibit, Plaintiff seemingly contends that a medical consultant has opined that Defendants are not providing him the correct diagnostic testing and treatment for esophageal achalasia. (ECF NO. 18, Ex. B). Such a disagreement with the course of treatment does

not constitute an Eighth Amendment deprivation and would set out, at best, a claim of medical negligence which is not actionable under 42 U.S.C. § 1983.

Nonetheless, as the Medical Defendants have indicated that further orthopedic surgery and gastroenterology consultations would be requested, the Court shall require a status report updating the undersigned as to Plaintiff's evaluations and treatment for his calcaneal hardware, along with his GERD and achalasia conditions, which shall include information regarding his weight and diet as well as recommendations regarding surgical myotomy.

## V.  CONCLUSION

For the aforementioned reasons, the Court finds no Eighth Amendment violations. Defendants Motions, construed as motions for summary judgment, shall be granted. A separate Order follows.

Date: <u>February 8, 2011</u>　　　　　　　　　　　/s/_____
　　　　　　　　　　　　　　　　　　　　ROGER W. TITUS
　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE